## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PRIORITY HEALTHCARE CORPORATION,   )
                                            )
        Plaintiff,               )
                                            )   C.A. No. _____
       v.                       )
                                            )
AETNA SPECIALITY PHARMACY, LLC, and   )
AETNA HEALTH HOLDINGS, LLC,       )
                                            )
        Defendants.            )
                                            )
                                            )

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, Priority Healthcare Corporation ("Priority"), brings this action for declaratory

judgment against Defendants Aetna Specialty Pharmacy, LLC ("ASP") and Aetna Health

Holdings, LLC ("Aetna Health") (collectively, "Defendants").

1.    This is an action for declaratory judgment in accordance with Rule 57 of the

Federal Rules of Civil Procedure and 28 U.S.C. § 2201.  Specifically, Priority seeks that the

Court declare certain rights and obligations of the parties that are in dispute under a Drug Supply

Agreement ("DSA") that was entered into between Priority and Defendants.

2.    First, Priority requests that the Court declare that pursuant to Sections 7.1 and

7.2.4 of the DSA, all obligations of Priority under the DSA were terminated, at the latest,

effective March 7, 2008, and there exists no enforceable obligation that requires Priority to

negotiate an extension of the DSA.

3.    Second, Priority requests that the Court declare that pursuant to Section 4.1 of the

DSA, ASP and Aetna Health are only entitled to review those "books and records" of Priority

that are "applicable to orders placed by ASP under" the DSA, and not under separate agreements between Defendants and pharmaceutical manufacturers.

## The Parties, Jurisdiction and Venue

4.      Plaintiff Priority is an Indiana corporation with its principal place of business located in Florida.

5.      On information and belief, Defendant ASP is a Delaware limited liability company and is a wholly-owned subsidiary of Aetna Inc. (a Delaware corporation).  In addition, ASP's principal place of business is located in Pennsylvania.

6.      On information and belief, Defendant Aetna Health is a Delaware limited liability company and is a wholly-owned subsidiary of Aetna Inc. (a Delaware corporation).  In addition, Aetna Health's principal place of business is located in Connecticut.

7.      This Court has jurisdiction over the dispute and the parties pursuant to 28 U.S.C. § 1332, in that Priority and the Defendants are citizens of different states, and in that the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

8.      Venue is proper in this district because, pursuant to Section 9.4 of the DSA, Defendants agreed to "consent and submit to the jurisdiction of the federal and/or state courts of the state of Delaware."  In addition, Defendants agreed that "any action or suit concerning [the DSA] or related matters shall only be brought by the parties in federal or state court with appropriate subject matter jurisdiction in the State of Delaware.

## General Allegations Relating to Termination of the DSA

9.      On August 1, 2004, Priority and Defendants entered into the DSA.  Under the DSA, Priority agreed to provide and supply ASP with certain specialty pharmaceuticals, all in accordance with the terms of the DSA.

2

10.    Section 7.1 of the DSA provides as follows:

Term:  The term of this Agreement shall commence on the date stated on the first sentence of this Agreement (the 'Effective Date') and shall continue until the later of February 28, 2008 or the date Priority first ceases to be a Member of ASP (the 'Initial Term').  ASP may renew this Agreement for up to two (2) successive (1) year terms (each a 'Renewal Term,' and together with the Initial Term, the 'Term') by notice to Priority at least (90) days before the end of such term.  **Upon expiration of the Term, all obligations of the Parties hereunder shall terminate, except as otherwise specifically provided herein.**

(emphasis added).

11.    In October 2005, Express Scripts, Inc. acquired Priority.  Subsequently, effective December 30, 2005, Priority ceased to be a member of ASP.

12.    Defendants did not provide Priority with notice that they wanted to renew the DSA at least ninety (90) days before the end of the Initial Term (February 28, 2008).

13.    Pursuant to the express terms of Section 7.1, the DSA terminated effective February 28, 2008, except as otherwise specifically provided in the DSA.

14.    Section 7.2.4 is titled "Transition Agreements and Transition Services Agreement."  In relevant part, this section provides that:

Upon the expiration or proper termination of this Agreement for any reason whatsoever, ASP and Priority will negotiate in good faith a transition services agreement **with a term of up to one (1) year** commencing upon such expiration or termination; provided, however, that such transition services agreement shall, at ASP's option, include, but not be limited to, the provision by Priority to ASP of an uninterrupted supply of all Specialty Pharmaceuticals required by ASP.  All purchases of Specialty Pharmaceuticals by ASP pursuant to such transition services agreement shall be at Priority's Best Price.  Furthermore, as part of any such transition services agreement, Priority will assist ASP in transitioning direct contractual relationships with all necessary drug wholesalers and manufacturers from Priority to ASP.

(emphasis added).

12.    Section 7.2.4 of the DSA does not specify the term of any potential transition services agreement.

3

13.    Rather, Section 7.2.4 of the DSA provides that Priority and ASP "will negotiate in good faith a transition services agreement with a term of up to one (1) year." As a result, the potential transition services agreement could conceivably have a term anywhere from one day to one year.

15.    On February 19, 2008, Priority advised Defendants that the DSA was going to terminate as of 12:01 a.m. on February 29, 2008. Accordingly, beginning February 29, 2008, Priority would no longer supply pharmaceutical drugs to Defendants pursuant to the DSA. See Ex. A; 2/19/08 letter from Sullivan to Myers.

16.    On February 27, 2008, Defendants responded by claiming that it would be "futile" for them to "seek to renew" the DSA. Defendants further claimed that DSA "expressly requires Priority to negotiate in good faith a transition services agreement." Finally, Defendants demanded that Priority "comply with all of its continuing obligations" under the DSA, "including but not limited to continuing to provide ASP with Priority's Best Pricing through February 29, 2009." See Ex. B; 2/27/08 letter from Myers to Sullivan.

17.    On February 28, 2008, Priority advised Defendants that they "failed to timely invoke Section 7.1" of the DSA. In addition, Priority stated that Section 7.2.4 of the DSA is unenforceable because it fails to "specify all the material and essential terms of any future 'transition services agreement.'" In particular, the language in Section 7.2.4 that purports to require Priority and ASP to negotiate a transition services agreement is unenforceable because it is nothing more than an agreement to agree in the future without any reasonably objective standards concerning the length of any such agreement – which is a material and essential term. See Ex. C; 2/28/08 letter from Sullivan to Myers.

18.     Notwithstanding the above, and without waiver of Priority's position that Section 7.2.4 is unenforceable, Priority further stated that it was "willing to enter into good faith negotiations with ASP and Aetna Health to discuss some type of an arrangement that would extend the terms of the DSA for a short period of time (but certainly not through February 28, 2009)." At the same time, Priority emphasized that "unless the parties are able to negotiate and enter into a mutually acceptable short-term transition services agreement by March 7, 2008, the DSA will terminate without any further notice or action … effective the close of business on March 7, 2008." Id.

19.     Defendants failed to respond to the foregoing letter.  Moreover, the parties did not enter into a mutually acceptable short-term transition services agreement by March 7, 2008.

20.     A real legal controversy exists between the parties concerning the proper interpretation and construction of Sections 7.1 and 7.2.4 of the DSA with respect to the termination of the DSA.

21.     Specifically, Defendants believe that Priority is obligated to continue to provide ASP with Priority's Best Pricing through February 29, 2009.

22.     On the other hand, Priority believes that all of Priority's obligations under the DSA were terminated, at the latest, effective March 7, 2008, and there exists no enforceable obligation that requires Priority to negotiate an extension of the DSA.

**General Allegations Relating to Audit Rights under the DSA**

23.     Section 4.1 of the DSA provides as follows:

Books and Records:  Upon reasonable prior notice, Priority will give ASP, Aetna and their respective advisers and representatives full access during normal business hours to review and make copies of all books and records of Priority **that relate to Specialty Pharmaceuticals ordered by ASP hereunder** or that are otherwise reasonably necessary to enable ASP and/or Aetna to review and order audit such orders and Priority's performance of Drug Supply Services, including all books and records relevant

5

to the calculation of Best Prices and the calculation and crediting of rebates, discounts, returns, credits, incentives and other adjustments **applicable to orders placed by ASP under this Agreement**, subject to any legal restrictions or restrictions necessary to maintain their confidentiality.

(emphasis added).

24.     On January 2, 2008, Defendants provided Priority with notice that pursuant to Section 4.1 of the DSA, Defendants wanted to inspect various "books and records" of Priority "that form the basis of Priority's 'Best Prices,' by month as calculated on the first business day of each month from August 1, 2004 through December 3, 2007" for twenty-five (25) different specialty pharmaceuticals. See Ex. D; 1/2/08 letter from Myers to Priority.

25.     On January 17, 2008, Priority advised Defendants that it "will evaluate your request in light of the litigation filed by Aetna against Express Scripts, Inc. and CuraScript, Inc. and respond as appropriate." See Ex. E; 1/17/08 letter from Sullivan to Myers.

26.     Specifically, on December 31, 2007, Defendants filed a Complaint in the United States District Court for the Eastern District of Pennsylvania against Express Scripts, Inc. and CuraScript, Inc. for alleged tortious conduct arising out of and relating to Priority's obligations under the DSA. Among other things, Defendants allege that since January 1, 2006, they have been forced to purchase specialty pharmaceuticals from third-parties under separate agreements between Defendants and pharmaceutical manufacturers, because ESI has allegedly improperly directed Priority not to sell such drugs to Defendants. A true and accurate copy of the Complaint is attached hereto as Ex. F.

27.     ESI denies the allegations in the Complaint. In addition, pursuant to the forum selection clause in the DSA (Section 9.4), ESI has filed a motion to transfer the Complaint to this Court. That motion is pending before the federal court in Pennsylvania.

28.     On January 28, 2008, Defendants responded to Priority's January 17, 2008 letter by demanding "full access" to "all the books and records" of Priority "that relate to Specialty Pharmaceuticals **ordered by ASP under the terms of the August 1, 2004 Drug Supply Agreement**." See Ex. G; 1/28/08 letter from Myers to Sullivan (emphasis added).

29.     On February 8, 2008, Priority responded by advising Defendants that Priority would agree to provide Defendants "with access to Priority's books and records that relate to the Specialty Pharmaceuticals identified in your January 2, 2008 letter which were ordered by ASP between August 1, 2004 and December 3, 2007." See Ex. H; 2/8/08 letter from Sullivan to Myers.

30.     On March 3, 2008, Defendants responded by requesting full access to books and records "for those pharmaceuticals products identified in our January 2, 2008 demand." See Ex. I; 3/3/08 letter from Myers to Sullivan.

31.     On March 5, 2008, Priority responded by suggesting that the parties meet and confer concerning this issue to ensure that Priority pull "the applicable documents." See Ex. J; 3/5/08 letter from Sullivan to Myers.

32.     On March 13, 2008, the parties met and conferred, but were not able to resolve their differences concerning this issue.

33.     A real legal controversy exists between the parties concerning the proper interpretation and construction of Section 4.1 of the DSA with respect to Priority's obligation to provide Defendants with access to certain books and records of Priority.

34.     Specifically, Defendants claim that they are entitled to review all the books and records of Priority that form the basis of Priority's 'Best Prices' (from August 1, 2004 through December 3, 2007) for twenty-five (25) different specialty pharmaceuticals, despite the fact that

7

Defendants did not order twenty-four of those drugs under the DSA, but rather, Defendants ordered such drugs under separate agreements entered into between Defendants and pharmaceutical manufacturers.

35.    On the other hand, Priority believes that Defendants are only entitled to review those books and records of Priority that form the basis of Priority's 'Best Prices' (from August 1, 2004 through December 3, 2007) for those specialty drugs that Defendants actually ordered under the DSA – either directly from Priority or from drug manufacturers pursuant to the terms and conditions of agreements between Priority and drug manufacturers.

### Count I (Declaratory Judgment)

36.    Priority repeats and re-alleges paragraphs 1 - 35 as though fully set forth herein.

37.    Pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201, this Court is vested with the power to determine questions regarding the construction and interpretation of contracts, and is further vested with the power to declare the rights, liabilities and obligations and other legal relations among parties to such contracts.

38.    By reason of the above general allegations set forth herein, a real, immediate, and justiciable controversy exists between Priority and Defendants with respect to whether all of Priority's obligations under the DSA were terminated effective, at the latest, March 7, 2008, and whether there exists an enforceable obligation that requires Priority to negotiate an extension of the DSA.

14.    In addition, by reason of the above general allegations set forth herein, a real, immediate, and justiciable controversy exists between Priority and Defendants with respect to whether Defendants are entitled to review only those books and records of Priority that form the basis of Priority's 'Best Prices' (from August 1, 2004 through December 3, 2007) for those

8

specialty drugs that Defendants actually ordered under the DSA– either directly from Priority or from drug manufacturers pursuant to the terms and conditions of agreements between Priority and drug manufacturers.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Priority respectfully requests that:

A)    The Court enter judgment declaring that all of Priority's obligations under the DSA were terminated effective, at the latest, March 7, 2008, and that there exists no enforceable obligation that requires Priority to negotiate an extension of the DSA;

B)    The Court enter judgment declaring that Defendants are entitled to review only those books and records of Priority that form the basis of Priority's 'Best Prices' (from August 1, 2004 through December 3, 2007) for those specialty drugs that Defendants actually ordered under the DSA– either directly from Priority or from drug manufacturers pursuant to the terms and conditions of agreements between Priority and drug manufacturers;

C)    The Court order Defendants to pay Priority's costs and reasonable attorneys' fees incurred in bringing this action; and

D)    The Court grant Priority such other and further relief as the Court may deem just and proper.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Joseph P. Conran
Christopher J. Valeriote
Omri E. Praiss
Christopher A. Smith
HUSCH BLACKWELL SANDERS LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105-1530
Tel: (314) 480-1500

Dated: March 13, 2008
854717 / 32814

By: _____
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    1313 N. Market Street
    Hercules Plaza, 6th Floor
    Wilmington, DE 19801
    Tel: (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

*Attorneys For Plaintiff*
*Priority Healthcare Corporation*

10

# EXHIBIT A



The Pathway to the Patient

6277 Lee Vista Boulevard, Orlando, FL 32822
ph: 888.773.7376   www.CuraScript.com

*An Express Scripts Company*

February 19, 2008

**VIA FACSIMILE (860) 907-4416
AND U.S. MAIL**

Eric B. Myers, Esq.
Counsel
Law & Regulatory Affairs, U13N
980 Jolly Road
Blue Bell, PA 19426

Re:     **Specialty Pharmacy Build and Services Agreement,
        Drug Supply Agreement, and Back-Up Specialty
        Pharmacy Mail Service Vendor Agreement**

Dear Mr. Myers:

The August 1, 2004 Specialty Pharmacy Build and Services Agreement ("Build and Services Agreement") between Priority Healthcare Corporation ("Priority"), Aetna Specialty Pharmacy, LLC ("ASP") and Aetna Health Holdings, LLC ("Aetna") will terminate on February 28, 2008, by its own terms. See Build and Services Agreement, § 16.1. The August 1, 2004 Drug Supply Agreement ("DSA") between Priority, ASP and Aetna will terminate on February 28, 2008, by its own terms.  See DSA, § 7.1. Likewise, the March 1, 2005 Back-Up Specialty Pharmacy Mail Service Vendor Agreement ("Back-Up Agreement") between Aetna Health Management, LLC and Priority also will terminate on February 28, 2008, by its own terms.   See Back-Up Agreement, § 7.1.

I write to confirm Priority's understanding that all three agreements will be terminated as of 12:01 a.m. on February 29, 2008.  Accordingly, beginning February 29, 2008, Priority will no longer supply pharmaceutical drugs or services pursuant to the terms of the Build and Services Agreement, the DSA or the Back-Up Agreement. I understand there have been discussions with our account management team with regard to certain drugs for Aetna Members under a payer agreement, as well as certain drugs via CuraScript Specialty Distribution for ASP. To my knowledge, the new arrangements have not been agreed upon between the parties. I will provide legal support to the account management team in these endeavors.

If you wish to discuss this matter, please feel free to contact me at 407.816.9873.

Sincerely,

*Kelly R. Sullivan*

Kelly R. Sullivan

KRS/ikc



EXHIBIT
**A**

# EXHIBIT B

FEB. 27. 2008  4:44PM    AETN LAW DEPT.

NO. 6023    P. 2

980 Jolly Road
Blue Bell, PA 19422

**✕Aetna™**

Eric B. Myers
Counsel
Law & Regulatory Affairs, U13N
(215) 775-6749
Fax: (860) 907-4416

**Via Fax 407-854-6556 and Overnight Mail**

February 27, 2008

Kelly R. Sullivan
CuraScript, Inc.
6272 Lee Vista Boulevard
Orlando, FL 32822

Re:    **Drug Supply Agreement; and Back-up Specialty Pharmacy Mail
       Service Vendor Agreement (collectively the "Agreements")**

Dear Ms. Sullivan:

This letter is in response to your letter dated February 19, 2008 concerning the above-referenced Agreements. As you are aware, in June of 2006, Mr. Lowenberg unequivocally repudiated Priority's continuing obligations pursuant to the Drug Supply Agreement ("DSA"). Priority's conduct before and after Mr. Lowenberg's repudiation confirms that Priority has not and will not honor the terms of the DSA and that Priority is, therefore, in material breach of the DSA. Given Priority's unequivocal refusal to honor the substantive terms of the DSA, it is futile for Aetna Specialty Pharmacy, LLC ("ASP") or Aetna Health Holdings, LLC to seek to renew it. Priority's clear repudiation of the DSA deprived ASP from receiving, *inter alia*, Priority's Best Prices through February 28, 2011. *See* DSA §§ 7.1; 7.2.4.

By way of further response, your February 19, 2008 letter further confirms that Priority has and will continue to act in complete disregard for its contractual obligations under the DSA. For example, you state that "beginning February 29, 2008, Priority will no longer supply pharmaceutical drugs or services pursuant to the terms of the" Agreements. However, the DSA expressly requires Priority to negotiate in good faith a transition services agreement and further requires that Priority continue to provide ASP "an uninterrupted supply of all Specialty Pharmaceuticals required by ASP" at Priority's Best Prices. DSA § 7.2.4.

Based on our review of the Agreements, it is our understanding that the Back-up Specialty Mail Service Agreement will not be terminating on February 28, 2008. Accordingly, ASP, Aetna Inc. and Aetna Health Holdings, LLC continue to reserve all of their rights and benefits under the Agreements, and without waiving such rights, hereby demand that Priority comply with all of its continuing obligations under the Agreements, including but not limited to continuing to provide ASP with Priority's Best Pricing through February 28, 2009.

Sincerely,

Eric B. Myers

EXHIBIT

B

# EXHIBIT C



CuraScript

The Partners in Care Pharmacy

5227 Lee Vista Boulevard, Orlando  FL 32822
ph 888.773.7376  www.CuraScript.com

An Express Scripts Company

February 28, 2008                                    Writer's Direct Dial: 407-816-9873

**VIA FACSIMILE (860) 907-4416
AND U.S. MAIL**

Eric B. Myers, Esq.
Counsel
Law & Regulatory Affairs, U13N
980 Jolly Road
Blue Bell, PA 19426

Re:    **Drug Supply Agreement and Back-Up Specialty
         Pharmacy Mail Service Vendor Agreement**

Dear Mr. Myers:

I write in response to your letter of yesterday concerning the above-referenced Agreements. We strongly disagree with your assertion that Priority has repudiated its obligations under the Drug Supply Agreement ("DSA") or breached the terms of the DSA. Nothing could be further from the truth. Priority has continued to perform under the terms of the DSA since Aetna Health Holdings, LLC ("Aetna Health") acquired Priority's membership interest in Aetna Specialty Pharmacy ("ASP") on December 30, 2005. In fact, it is my understanding that ASP has ordered and received drugs and related products pursuant to the DSA numerous times since that date.

Accordingly, your claim that it would have been "futile" for ASP or Aetna Health to comply with Section 7.1 of the DSA, and renew its terms for another year, is without merit. Moreover, it is belied by your letter wherein you now claim that your clients "hereby demand that Priority comply with all of its continuing obligations under the Agreements" and that Priority's alleged repudiation of the DSA has deprived ASP from receiving "Best Prices through February, 28, 2011." Clearly, ASP and Aetna Health failed to timely invoke Section 7.1. Therefore, "all obligations of the Parties hereunder shall terminate, except as otherwise specifically provided herein." *See* DSA, Section 7.1.

Your letter cites Section 7.2.4 of the DSA and claims that Priority is required to negotiate in good faith a transition services agreement and provide ASP with Specialty Pharmaceuticals at Best Price. It is curious that you have decided to wait until two days
efore the DSA expires to raise this issue. In any event, that provision of Section 7.2.4 is unenforceable under Delaware law.[1]  To be enforceable, Delaware law requires that an agreement to enter into a future contract (i.e., "a transition services agreement with a term of up to one (1) year commencing upon such expiration or termination" of the DSA) must specify all

---

[1] The terms of the DSA are governed by Delaware law. *See* DSA, Section 9.4.



EXHIBIT
C
PENGAD 800-631-6989

Correspondence to Eric Myers
February 28, 2008
Page 2

of the material and essential terms and "leave none to be agreed upon as a result of future negotiations." *Raisler Sprinkler Co. v. Automatic Sprinkler Co. of Am.*, 171 A. 214, 219 (Del. Super. Ct. 1934); *see also Hammond & Taylor, Inc. v. Duffey Tingue Co.*, 161 A.2d 238, 239-40 (Del. Ch. 1960).

Clearly, Section 7.2.4 fails to meet this requirement since it does not specify all of the material and essential terms of any future "transition services agreement," and leaves such terms to be agreed upon as a result of future negotiations. Moreover, the length of any such future agreement also would be a material and essential term. The phrase "up to one year" fails to supply that essential term, and leaves the term as something left to future bargaining between the parties; thus, it is unenforceable.

That being said, and without waiver of my clients' position that Section 7.2.4 is unenforceable, Priority is willing to enter into good faith negotiations with ASP and Aetna Health to discuss some type of an arrangement that would extend the terms of the DSA for a short period of time (but certainly not through February 28, 2009). Additionally, CuraScript Specialty Distribution is willing to enter into a similar arrangement with ASP and Aetna Health at price terms comparable to other customers. If your clients have an interest in either of these arrangements, please contact me immediately so that we can schedule those discussions. In the meantime, Priority will continue to perform under the DSA, on a day-to-day basis, through and including March 7, 2008. However, unless the parties are able to negotiate and enter into a mutually acceptable short-term transition services agreement by March 7, 2008, the DSA will terminate without any further notice or action by my clients effective the close of business on March 7, 2008.

Finally, in October 2007, Priority and Aetna Health entered into a Letter of Agreement ("LOA") whereby Priority agreed to provide the drugs Iressa, Ventavis and Zavesca at the rates set forth in the LOA, and pursuant to the terms of the Back-up Specialty Pharmacy Mail Service Vendor Agreement ("Back-up Agreement"), through March 1, 2008. Priority will continue to honor the LOA through March 1, 2008. I understand that our respective clients are currently engaged in discussions over potentially extending the LOA but have not reached any agreement. Accordingly, other than the date discrepancy noted above, I do not understand your statement that the Back-up Agreement will not be terminating on February 28, 2008. Please explain.

Sincerely,

Kelly Sullivan

Kelly R. Sullivan

KRS/ikc

# EXHIBIT D



Eric B. Myers
Counsel
Law & Regulatory Affairs, U13N
980 Jolly Road
Blue Bell, PA 19426

(215) 775-6749
Fax: (860) 907-4416

January 2, 2008

**VIA UPS OVERNIGHT DELIVERY**

Rebecca Shanahan, Esquire
Executive Vice President and General Counsel
Priority Health Corporation
250 Technology Park
Lake Mary, FL 32746

James A. Aschleman, Esquire
Baker & Daniels
300 North Meridian Street, Suite 2700
Indianapolis, IN 46204

RE:    Notice Pursuant to August 1, 2004 Drug Supply Agreement

Dear Ms. Shanahan and Mr. Aschleman:

Pursuant to Sections 9.7 ("Notices") and 4.1 ("Books and Records") of the August 1, 2004 Drug Supply
Agreement (the "Agreement") by and among Priority Healthcare Corporation ("Priority") Aetna Specialty
Pharmacy, LLC ("ASP") and Aetna Health Holdings, LLC ("Aetna Health"), ASP and Aetna Health hereby
provide Priority written notice of its demand for "full access" to "all books and records of Priority that relate
to Specialty Pharmaceuticals ordered by ASP" under the terms of the Agreement "or that are otherwise
reasonably necessary to enable ASP" and "Aetna to review and audit such orders and Priority's
performance of Drug Supply Services, including all books and records relevant to the calculation of Best
Prices (as defined in Section 1.7 of the Agreement) and the calculation and crediting of rebates,
discounts, returns, credits, incentives, and other adjustments applicable to orders placed by ASP under
the Agreement."

ASP and Aetna Health have, as you aware, repeatedly requested confirmation that Priority was providing,
as required by the specific terms of the Agreement, ASP with the benefit of Priority's "Best Prices" as
further required by the Agreement.

To date, you have refused to provide ASP and Aetna Health with that information, and more specifically
the documents and/or contracts supporting your compliance with the Best Price obligations to which
Priority specifically and unequivocally agreed. This contractual obligation assumed by Priority was a
material condition of the Agreement.

Consistent with the terms of the Agreement set forth above, ASP and Aetna Health demand that Priority
make available to ASP and Aetna Health, at the offices of Elliott Greenleaf & Siedzikowski, P.C., 925
Harvest Drive, Suite 300, Blue Bell, PA 19422, on or before January 18, 2008, representative contracts,
including any information concerning rebates, discounts, or any other agreements with manufactures that
form the basis for Priority's "Best Prices," by month as calculated on the first business day of each month
from August 1, 2004 through December 3, 2007, for the following prescription drugs:

|   |   |
|---|---|
| 1 | ENBREL |
| 2 | HUMIRA |
| 3 | AVONEX |



Ms. Sanan and Mr. Aschleman
January 2, 2008
Page 2

| | |
|---|---|
| 4 | COPAXONE |
| 5 | SYNAGIS |
| 6 | XOLAIR |
| 7 | REBIF |
| 8 | NUTROPIN |
| 9 | CEREZYME |
| 10 | LUPRON |
| 11 | PROCRIT |
| 12 | BETASERON |
| 13 | HUMATROPE |
| 14 | GENOTROPIN |
| 15 | REVLIMID |
| 16 | PEGASYS |
| 17 | NEULASTA |
| 18 | RECOMBINATE |
| 19 | NEUPOGEN |
| 20 | GONAL-F |
| 21 | FORTEO |
| 22 | FOLLISTIM |
| 23 | RIBAVIRIN |
| 24 | ARANESP |
| 25 | NORDITROPIN |

**ADDITIONAL DRUGS
TO BE IDENTIFIED BY
CLIENT**

ASP and Aetna Health presently limit the above request to all documents relevant to the calculation of Best Prices for the above listed drugs and manufacturers from August 1, 2004 through and including December 3, 2007, but reserve the right to request additional information pursuant to the Agreement.

In light of Priority's express refusal to comply with its contractual obligations and due to the likelihood that disputes relating to Priority's breaches of its agreements with ASP and Aetna Health will be resolved in adversarial proceedings, we request that you immediately preserve and retain all documents and records, electronic or otherwise, relating to the Drug Supply Agreement, the Limited Liability Company Agreement, the Contribution Agreement, the Build and Services Agreement, the Participating Provider Agreement and the Back-up Provider Agreement, including but not limited to all documents relating to drug pricing, such as contracts, communications and financial documents concerning pharmaceutical vendors, suppliers and manufacturers.

We look forward to your prompt good faith response to this request consistent with your above stated contractual obligations.

Sincerely,

Eric B. Myers

# EXHIBIT E



CuraScript
The Pathway to the Patient

6272 Lee Vista Boulevard, Orlando, FL 32822
ph: 888.773.7376  www.CuraScript.com

*An Express Scripts Company*

January 17, 2008

Via FedEx #: 7909 1920 6015

Eric B. Myers, Esq.
Law & Regulatory Affairs, U13N
980 Jolly Road
Blue Bell, PA 19426

     Re:    Notice Pursuant to August 1, 2004 Drug Supply Agreement

Dear Mr. Myers:

Your correspondence dated January 2, 2008 regarding the referenced subject was
forwarded to me for response. I received the letter January 15, 2008.

This correspondence acknowledges receipt of your request. We will evaluate your
request in light of the litigation filed by Aetna against Express Scripts, Inc. and
CuraScript, Inc. and respond as appropriate.

Sincerely,

*Kelly R. Sullivan*

Kelly R. Sullivan

KRS/ikc

EXHIBIT
E

# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AETNA INC.<br>980 Jolly Road<br>Blue Bell Pa 19422<br><br>AETNA SPECIALTY PHARMACY, LLC.<br>980 Jolly Road<br>Blue Bell, PA 19422<br><br>AETNA HEALTH HOLDINGS, LLC<br>151 Farmington Ave.<br>Hartford, CT 06156<br><br>       Plaintiffs,<br><br>      v,<br><br>EXPRESS SCRIPTS, INC.<br>One Express Way<br>St. Louis, MO 63121<br><br>CURASCRIPT, INC.<br>6272 Lee Vista Boulevard<br>Orlando, FL 32822<br><br>      Defendants. | CIVIL ACTION NO.<br><br>O 7 5 5 4 1<br><br><br><br><br>JURY TRIAL DEMANDED |

## CIVIL ACTION COMPLAINT

This action is brought by Plaintiff, Aetna Specialty Pharmacy, Inc. ("ASP"), Aetna Health Holdings, LLC ("Aetna Health"), and Aetna Inc. ("Aetna")(collectively "Plaintiffs"). By this action, Plaintiffs seek damages, injunctive relief and to recoup overpayments made for pharmaceutical products as a result of Express Scripts, Inc.'s ("Express Scripts") and CuraScript, Inc.'s ("CuraScript")(collectively "Defendants") tortious interference with Plaintiffs' agreements with Priority Healthcare Corporation ("Priority"), including but not limited to recouping the


EXHIBIT
F

$75,000,000.00 paid to Defendant Express Scripts that Express Scripts retains, despite depriving Plaintiffs of the benefit of their bargains.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the claims asserted herein pursuant to diversity jurisdiction, 28 U.S.C. § 1332, and supplemental jurisdiction, 28 U.S.C. § 1367.

2.      This Court also has original jurisdiction over Plaintiffs claims under 35 U.S.C. § 292 *et seq*.

3.      Venue in this Court is proper as health benefits plans involved in this action are administered in whole or in part in this District.  Venue in this Court is also proper as Aetna's principal place of business is in this District.  Venue is also proper in this District as the unlawful conduct described herein was directed toward Aetna and its facilities in this District.  Further, Express Scripts regularly conducts business in this District including but not limited to the negotiation of agreements and the sale and distribution of pharmaceutical products related to the instant dispute.

## THE PARTIES

4.      Aetna is a Pennsylvania corporation headquartered in Connecticut and with its principal place of businesses 980 Jolly Road, Blue Bell, Pennsylvania.

5.      ASP is a Delaware Corporation, headquartered in Blue Bell, Pennsylvania, and is a wholly owned subsidiary of Aetna.

6.      Aetna Health is a Delaware limited liability company with a principal place of business in Connecticut.  Aetna Health is also a wholly owned subsidiary of Aetna.

2

7.    Aetna is one of the nation's leading diversified health care benefits companies, serving approximately 36.6 million people with information and resources to help them make better informed decisions about their health care.

8.    In 2004, for example, Aetna spent more than $1 billion annually on specialty pharmaceuticals, an area with a national growth rate in excess of 20 percent.

9.    ASP serves customers including Aetna members with chronic conditions who suffer from diseases such as cancer, Crohn's Disease, cystic fibrosis, Gaucher's Disease, hemophilia, hepatitis, HIV/AIDS, Multiple Sclerosis, pulmonary hypertension, renal failure, respiratory syncytial virus (RSV), rheumatoid arthritis, organ transplants and anemia. Medications for these diseases are expensive, and administration of those medications requires intensive coordination.

10.    Defendant, Express Scripts is a Missouri Corporation, and is, as touted in its 2006 annual report, "one of the largest full-service pharmacy benefit management ("PBM") companies."

11.    Defendant CuraScript, a Delaware Corporation with its principal place of business at 6276 Lee Vista Blvd., Orlando, FL, 32822, is a wholly owned subsidiary of Defendant Express Scripts.

12.    Defendants Express Scripts and CuraScript, were at all relevant times, direct competitors of ASP.

13.    Express Scripts, as one of the largest PBM companies, provides PBM services to over 50 million members and generates over $18 billon a year in revenue.

14.    According to the "Corporate Profile" on its web site, "Express Scripts harnesses market forces to make prescription drugs more affordable. The Company develops formularies,

3

negotiates discounts from retail pharmacies and drug manufacturers, encourages the use of lower-cost brand and generic drugs and consults with clients on benefit design. Express Scripts serves thousands of client groups including managed care organizations, health insurers, employer groups, third party administrators and government-sponsored plans."

15.    In conducting its business, Express Scripts requires compliance with a Code of Ethics, which mandates "honest and ethical" conduct, including "[p]roactively promot[ing] ethical and honest behavior within Express Scripts and its subsidiaries and affiliates."

16.    Defendants Express Scripts and CuraScript violated the law and their own Code of Ethics by, *inter alia,* tortiously interfering with and conspiring to interfere with ASP's Joint Venture Agreement and Drug Supply Agreement with Priority to deprive ASP of the material benefits of those Agreements to ASP's and Aetna's members' detriment.    As a result of Defendants' improper and unprivileged conduct, Priority breached its fiduciary duties to Plaintiffs.

17.    Defendants' tortious misconduct and interference with Plaintiffs' legally protected interests is ongoing.

## BACKGROUND FACTS

### A.    ASP, Aetna, Aetna Health And Priority Enter into the LLC and Drug Supply Agreements.

18.    On August 1, 2004, ASP, Aetna, Aetna Health and Priority entered into a Limited Liability Company Agreement ("LLC Agreement") and a series of ancillary agreements including a Drug Supply Agreement ("DSA")(collectively the "Agreements") creating a joint venture for the purpose of establishing, building, owning and operating a stand alone integrated specialty pharmacy business and included Clinical Programs.

4

19.     The joint venture between Priority and ASP was intended to conduct business as a Limited Liability Corporation known as ASP and was to be focused on building and operating "best in class" specialty pharmacy services including leveraged buying power to reduce health care costs and deliver comprehensive clinical program management for ASP customers.

20.     At the time of the LLC and DSA Agreements, Priority was a publicly traded company and operated as a pharmacy and distributor of specialty pharmaceutical products and services.

21.     Priority was, at the time of the Agreements with Plaintiffs, in the business of providing biopharmaceuticals, complex therapies, related disease treatment programs and other service offerings for patients, payors, physicians and pharmaceutical manufacturers.

22.     The specialty areas serviced by Priority included oncology, gastroenterology, reproductive endocrinology, neurology, hematology, pulmonology, ophthalmology, rhuematology, endocrinology, infectious disease and nephrology, as well as ambulatory surgery centers.

23.     As a measure of its volume of business, Priority at the time of the Agreements sold over 5,000 Stock Keeping Units ("SKUs") of specialty pharmaceuticals and medical supplies to outpatient renal care centers and office-based physicians in oncology and other physician specialty markets.

24.     Priority also, as a part of its specialty pharmacy business, provided for the shipping of refrigerated pharmaceuticals overnight in special packaging and offered automated order entry services and customized distribution for group accounts.

25.    At the time of the Agreements, Priority itself serviced over 7,000 customers in all 50 states, including office-based oncologists, renal dialysis clinics, ambulatory surgery centers and primary care physicians.

26.    At the time of the Agreements, Priority also filled individual patient prescriptions, primarily for self-administered biopharmaceuticals. These patient-specific prescriptions were filled at 32 licensed pharmacies in 17 states and are primarily shipped directly to the patient overnight in specialized packages.

27.    Priority at the time of the Agreements also provided disease treatment programs for hepatitis C, cancer, infertility, hemophilia, human growth hormone deficiency, rheumatoid arthritis, Crohn's disease, pulmonary hypertension, pain management, multiple sclerosis, sinusitis, age-related macular degeneration, idiopathic pulmonary fibrosis, immune deficiencies, psoriasis, cystic fibrosis and others.

28.    Priority was at the time also a provider of reimbursement systems and product support to pharmaceutical manufacturers, biotechnology companies and medical device companies.

29.    All of the above services, market positions and existing and prospective contractual relationships with third party suppliers and manufacturers and the resulting economies of scale, increased purchasing power and good will that were central to Priority's fully and faithfully performing its contractual obligations, duties and obligations to ASP pursuant to the LLC and DSA Agreements, including its post option exercise duties.

30.    Indeed, Priority intended to exploit its anticipated increased purchasing volume resulting from the joint venture not only to provide significantly better if not preferential pricing for ASP, but for itself as well.

31.     Priority also anticipated that the joint venture would allow it to capitalize on and expand its "high value" purchasing relationships with pharmaceutical manufacturers and suppliers.

32.     Significantly, the LLC Agreement contemplated that the parties would simultaneously execute the DSA, which they did. LLC agreement, Section E.[1]

33.     Among the material rights bargained for and agreed upon by the parties was an option whereby Plaintiffs could purchase Priority's membership interest in the ASP for $75,000,000.00 (seventy five million dollars). LLC Agreement, Section 6.3(a).

34.     Further, central to the covenants, representations and warranties of the LLC Agreement and the DSA was Priority's established and future market position, long range plan, experience and ability to successfully negotiate "best prices", beneficial rates, terms and conditions with third party suppliers and manufacturers in terms that were most favorable to ASP including, as it was expressed in the LLC Agreement, for a substantial period after the Purchase Option under the LLC Agreement was exercised by Plaintiffs.

35.     Under the LLC Agreement, a purchase option provision of the LLC Agreement could be triggered by a change of control of Priority. LLC Agreement Sections 6.3 (a) (ii), 6.4.

---

[1] The LLC Agreement contains a Confidentiality Provision that is incorporated into the DSA. As a reasonable step to preserve the confidentiality of proprietary information, including the terms of the Agreements, Plaintiffs only generally reference the provisions of those Agreements to provide Defendants notice of the terms and conditions that they caused Priority to breach as required under the Federal Rules of Civil Procedure.  Simultaneously with the filing of the instant complaint, Plaintiffs are filing a Motion for Leave to File Agreements Under Seal. LLC Agreement Section 11.10.

B.    **Defendants Interfere With Priority's Material Obligations To Plantiffs.**

36.    The DSA and LLC Agreement, by incorporation, *inter alia*, explicitly require Priority to use in good faith reasonable commercial efforts to identify for ASP means for securing better, i.e. " best prices",  terms for the purchase of certain pharmaceuticals. DSA Agreement Sections 2.2, 2.13.

37.    Pursuant to the DSA, Priority is obligated to supply all of ASP's requirements of specialty pharmaceuticals. DSA Agreement Section 2.1 (ii).

38.    Further, Priority is obliged to directly supply Specialty Pharmaceuticals to ASP whenever "it is not practicable to utilize a third party supplier...or when it is more cost effective to ASP". DSA Agreement Section 2.1 (ii).

39.    The DSA, *inter alia*, also requires Priority to provide ASP with its best pricing, as defined under the DSA, for certain pharmaceutical products plus a small specified service fee and, in certain cases, other specified fees and charges. DSA Agreement Section 3.1, 3.2.

40.    Priority also has express obligations under the LLC Agreement and DSA to fully account for and credit to ASP and to administer, pursue and collect all rebates and discounts, returns, credits and other similar adjustments, including any funds or credits from manufacturers and other incentives. DSA Agreement Section 2.8.

41.    Priority also has a duty under the DSA to supply ASP with copies of all of its supply contracts with third party vendors. DSA Agreement Section 2.2.

42.    Further, the "best pricing" covenants contained in the LLC and DSA contemplated that ASP was to receive from Priority, or any of its affiliates, the full benefit from any third party suppliers,  including any rebate, discount, return, credit and/or incentives, regardless of when or how paid or credited. DSA Agreement Section 2.8.

43.    Also, the Agreements require Priority to accurately maintain all books and records that would allow ASP to confirm that it was actually receiving Priority's best pricing. DSA Agreement Sections 3.4, 4.1.

44.    Under the DSA and the LLC Agreement, Priority was to fully and accurately account for and pay, credit or otherwise provide adjustments to ASP for all rebates, discounts, credits, returns and incentives within 30 days of receipt of any discount, rebate or incentive by Priority.  DSA Agreement Section 3.4.

45.    Under the DSA, Priority is, on an ongoing basis, to provide ASP with full and accurate written reports of Priority's providing its "best prices" to ASP. DSA Agreement Section 3.4.

46.    Further under the DSA, ASP is also entitled to request and receive candid analytic reports, as ASP may request, or documentation of Priority's actual net acquisition costs of specialty pharmaceuticals. DSA Agreement Section 3.4.

47.    The DSA also expressly provides that all records created by Priority for ASP's operations, including pharmacy records, belong to ASP. DSA Agreement Section 4.2.

48.    The DSA also explicitly allows ASP to audit Priority's books and records to determine if ASP was receiving Priority's best prices as required under the DSA. DSA Agreement Section 4.1.

49.    By their express terms, the DSA and LLC Agreement were intended to provide transparency that would allow ASP to determine if it was actually receiving Priority's best prices.

9

50.    Further, the DSA also required Priority to provide ASP with an uninterrupted supply of all specialty pharmaceuticals required by ASP even after the exercise of Aetna Health's "buy out" option under the LLC Agreement.

51.    The DSA also mandated that Priority would, subsequent to the exercise of the LLC Agreement "Buy Out" option, continue to provide certain pharmaceuticals at Priority's best prices and that Priority would also assist ASP to transition Priority's direct supply agreements with pharmaceutical manufacturers and wholesalers, including, *inter alia*, by providing ASP with pharmaceutical vendor and supplier contracts, by providing ASP with lists of key contacts at certain pharmaceutical vendors and suppliers and setting up meetings with such vendors and suppliers. DSA Agreement Sections 3.1, 7.24.

**C.    Express Scripts Purchases Priority, triggering Aetna Health's Purchase Option.**

52.    On October 14, 2005, approximately fourteen months after the execution of the LLC Agreement and the DSA, Defendant Express Scripts acquired the capital stock of Priority in a cash transaction for $28 per share, or approximately $ 1.3 billion. The acquisition was accomplished through the merger of wholly-owned subsidiary CuraScript with and into Priority.

53.    Priority, headquartered in Lake Marie, Florida, was at the time, among the nation's largest Specialty and distribution companies, with approximately $1.7 billion in annual revenue during 2004 and approximately $1.1 billion in revenue for the six months ended July 2, 2005.

54.    The $1.3 billion purchase price of Priority by Express Scripts and merger into CuraScript was financed with approximately $167 million cash on hand and the remainder

10

adding $1.6 billion in Term A loans through a new credit facility. *See* Express Script's 2005 Annual Report at pp. 68-69.

55.    Previously, on January 30, 2004, approximately five months after Priority entered into the Agreements with Plaintiffs, Defendant Express Scripts bought CuraScript further enhancing its market power and advancing Express Scripts intention to dominate the Specialty Pharmacy Market.

56.    Express Scripts' 2005 Annual Report further notes that "[o]n January 30, 2004, we acquired the outstanding capital stock of CuraScript, for approximately $334.4 million . . . . CuraScript is one of the nation's largest Specialty services companies and has enhanced our ability to provide comprehensive pharmaceutical management services to our clients and their members." *Id.* at p.69.

57.    As a result of its acquisition of CuraScript, Express Scripts reported that in 2005 its specialty pharmacy revenues had increased 330%.
http://www.lexdon.com/article/Express_Sripts_ Reports_Record Fourth/35393.html.

58.    On July 22, 2005, barely a year after Express Scripts acquired CuraScript, Express Scripts' CEO, George Paz, announced that Defendant Express Scripts had grown CuraScript's revenues from $300 hundred million to over one billion dollars per year. *Priority Healthcare Corp (form DEFA 14 A) (Express Scripts, Inc. merger and acquisition announcement)*.

59.    CuraScript's web site boasts that, "[i]n October 2005, Express Scripts completed the acquisition of Priority Healthcare Corporation to create one of the largest specialty pharmaceutical dispensing and distribution company [sic] in the United States. Priority Healthcare was the recognized industry leader in specialty dispensing and distribution for

11

multiple markets. Due to the capabilities and increased resources of the two entities, CuraScript is strategically positioned to create customized programs, staffed with dedicated experts, that will grow our pharmaceutical manufacturer's business while remaining 100% committed to exceptional patient care." *See* http://www.curascript.com/content/home_history.htm.

60.    Before Express Scripts purchased Priority for $1.3 billion, Express Scripts, as a publicly traded company, conducted a thorough due diligence of Priority's operations and Priority's contractual obligations, including but not limited to Priority's obligations and commitments to ASP, Aetna and Aetna Health under the LLC Agreement and the DSA.

61.    Indeed, the President and CEO of CuraScript, Dominick Meffe, admitted in a published report in the St. Louis Business Journal that the analysis of the acquisition of Priority by Express Scripts began in the summer of 2004, and that "it took an unbelievable amount of study." St. Louis Business Journal, "The deal: Express Scripts Inc. purchases Priority Healthcare Corp", Friday December 16, 2005.

62.    During Express Scripts' negotiations and "study" with Priority, it is apparent that Express Scripts and its consultants, agents, officers and attorneys became aware of the legal and moral obligations and duties owed by Priority to Plaintiffs under the Agreements, and undertook a course of intentional conduct to conspire and otherwise effect a scheme to interfere with Plaintiffs' legitimate business interests.

63.    Express Scripts, as a sophisticated, publicly traded company, knew that in merging and purchasing the assets of Priority, it was also purchasing Priority's express contractual obligations and duties to ASP, Aetna and Aetna Health, including, *inter alia*, Priority's ongoing Best Pricing guarantees and ASP's ownership of support documents and

12

rights to audit Priority's books and records, including information relating to supplier and third party manufacturer's pricing and contracts.

64. Express Scripts also knew that Priority's obligations to continue to provide ASP with its best pricing, to assist in good faith the transition of <u>all</u> of Priority's direct supply agreements with pharmaceutical wholesalers, to provide ASP with copies of <u>all</u> Specialty Pharmaceutical vendor and supplier contracts, to provide ASP with a list of contacts at such vendors and suppliers and to assist ASP in setting up meetings with those vendors and suppliers would survive the Agreements.

65. It is believed, even before the purchase of Priority was announced, that Defendants Express Scripts and CuraScript intended to deprive ASP, Aetna and Aetna Health of the benefits of the LLC Agreement and the DSA and to, therefore, injure or destroy ASP's efforts to establish a successful "best of class" stand-alone, independent Specialty Pharmaceutical Business by depriving it of its best pricing guarantees and the benefit of Priority's supplier and vendor contacts.

66. Further, by interfering with and causing the denial of the material benefits of the Agreement with Priority and the benefits of the DSA and LLC Agreements, Defendants have gained an unfair competitive advantage which includes the *de facto* preclusion of Plaintiffs from prospective advantageous relationships and markets.

67. It is believed that Defendants intended, *inter alia*, to disadvantage, induce, direct or otherwise interfere with Plaintiffs' rights and interests and cause Priority to dishonor its legal obligations under the LLC Agreement and DSA to ASP in the highly competitive specialty pharmaceutical market to gain an unfair competitive advantage over ASP for its newly acquired subsidiary CuraScript.

13

68.    On October 14, 2005, Express Scripts announced that it had completed the merger and acquisition of Priority. Specifically, Express Scripts noted that, "[t]he combined Priority and CuraScript will be one of the nation's largest specialty pharmacy and distribution companies, with over $3 billion in annual revenues. Specialty pharmaceuticals are the fastest growing component of prescription drug spend [sic] and the combined company will provide a single source solution for comprehensive biopharmaceutical services." http://phx.corporate-ir.net/phoenix.zhtml?c=69641&p=irol-newsArticle&ID=767928&highlight=.

69.    On October 25, 2005, Plaintiffs, pursuant to the Purchase Option in the LLC Agreement, gave Priority notice that it intended to exercise its Purchase Option and that the closing of Aetna Health's Purchase of Priority's Membership interest in the LLC Agreement would take place on December 30, 2005. LLC Agreement 6.3 (a).

70.    Plaintiffs' notice of the exercise of their Purchase Option was directed to Dom Meffe, who at the time was a Senior Vice President and CEO of CuraScript.

71.    On October 25, 2005, in response to Plaintiffs' Notice of Purchase Option Exercise, David Lowenberg, Chief Operating Officer ("COO") of Express Scripts, indicated that he would be responsible for negotiating terms relating to the ASP Purchase Option.

72.    Mr. Lowenberg was a highly compensated executive of Express Scripts and ultimately took the position of CEO of CuraScript.

73.    During the next several months, the parties continued to effect the transition contemplated under the terms of the Agreements.

74.    On December 28, 2005, Eric Elliott, on behalf of ASP wrote an e-mail to Mr. Lowenberg regarding the completion of the "buyout" transition and again reiterated and confirmed that all of the terms and obligations under Agreements remained unaltered and that

14

Priority had continuing obligations to ASP under the Agreements, including but not limited to its duties and obligations under the DSA.

75.     In that e-mail to Defendant Express Scripts' COO Lowenberg, Plaintiffs reasonably sought assurances and confirmation that Priority would, as a part of its post "buy out" obligations to ASP, continue to supply ASP with the critical drugs that were distributed with Priority.

76.     Mr. Elliott's confirming e-mail stated that, "[a]lthough we have received numerous assurances on this point from various levels at Priority, given the importance of that drug supply agreement to [ASP] and Aetna's members, I would like to have this confirmed by you as well."

77.     Both Mr. Elliott's e-mail and the attached letter further confirmed that Aetna was insisting on Priority's compliance with the terms of the Agreements and reserving "all of its rights under the ASP joint venture agreements, including the Build and Service Agreement, the Contribution Agreement, **the Drug Supply Agreement** and the Back-Up Provider Agreement, **which by their terms will continue in effect after the closing.**" (emphasis added).

78.     Mr. Lowenberg never advised Plaintiffs, during this transition period, that Defendants Express Scripts and CuraScript were interfering with, directing or planning to cause Priority to dishonor the material obligations due Plaintiffs under the LLC Agreement and DSA.

79.     On December 30, 2005, Aetna Health wired, at the direction of Express Scripts, $75 Million into Express Scripts' bank as payment for the "buy out" option under the terms of the LLC Agreement.

15

**D.  Express Scripts Takes the $75,000,000.00 and Deprives Plaintiffs of Their Contractual Benefits.**

80.     Subsequent to the closing and transmittal of the $75 Million, Express Scripts and CuraScript continued to act and induced Plaintiffs to believe that they intended to ensure Priority's compliance with all the material terms of the Agreements.

81.     On August 8, 2006, subsequent to the exercise and closing of Aetna Health's Purchase Option, as contemplated in Mr. Elliott's December 28, 2005 e-mail to Mr. Lowenberg, Aetna Health representatives again conferred with Mr. Lowenberg to discuss outstanding transition issues relating to ASP and its ongoing operation, including but not limited to Priority's continuing and enforceable obligations under the DSA.

82.     Subsequent to the closing of the Purchase Option, Plaintiffs continued to request continuing confirmation of Priority's full compliance with its duties and obligations to ASP under the LLC Agreement and the DSA.

83.     Indeed on August 8, 2006 a conference call was conducted by executives of Plaintiffs with CEO of CuraScripts, David Lowenberg, and Plaintiffs properly continued to insist that Priority honor all its material obligations under the LLC Agreement and the DSA.

84.     Further Plaintiffs specifically confirmed to Mr. Lowenberg, as he knew, that Priority had absolute and continuing obligations to provide best prices to ASP under the Agreements and to continue to provide documentary proofs that Priority was complying with those obligations.

85.     Plaintiffs further advised Mr. Lowenberg that, should Priority fail to honor its legal and contractual commitments to Plaintiffs, Plaintiffs would suffer damages in the range of millions of dollars and that Plaintiffs would lose substantial business opportunities and access to

16

critical markets in the specialty pharmacy business, which were to be provided by Priority under the Agreements.

86.    During this telephone conference, Mr. Lowenberg, for the first time, represented that Priority would not honor its continuing obligations under the LLC Agreement and the DSA.

87.    Mr. Lowenberg was informed that Priority's failure to honor the terms of the LLC Agreement and the DSA was a breach of the parties' Agreements and that Aetna Health would demand Priority's full compliance with Agreements as well as full compensation for Priority's breach of those Agreements.

88.    Mr. Lowenberg, who was aware of Priority's contractual and fiduciary duties and knew that he, CuraScript and Express Scripts never intended to allow Priority to perform those legal duties to Plaintiffs or allow Plaintiffs to receive the full benefit of their bargain with Priority, cynically replied, in substance, **"we will never write that check."**

89.    As noted above, Express Scripts and CuraScript have generously rewarded Mr. Lowenberg for his role in their business ventures, including but not limited to his direction of Express Scripts' plan to interfere with Aetna's, ASP's and Aetna Health's rights under the LLC Agreement and the DSA.

90.    It is apparent that Defendants never intended to allow Priority to comply with its explicit legal obligations to ASP to use in good faith, reasonable commercial efforts to provide and continue to identify means for securing better pricing terms for the purchase of certain pharmaceuticals as required under the DSA.

91.    Further, Defendants also never intended to allow Priority to provide ASP with its best pricing, which is a defined term under the DSA, for specified pharmaceutical products.

17

92.    Also, Defendants never intended to allow Priority to maintain accurate books and records and generate contemporaneous reports that would allow Plaintiffs to monitor and if necessary, audit Priority's compliance with its obligations under the DSA and LLC Agreements.

93.    Also significantly, Defendants never intended to allow Plaintiffs to audit Priority's books and records to accurately determine if they were receiving, as promised, Priority's best prices as required under the DSA.

94.    Defendants conduct was willful, intentional, reckless and malicious.

95.    Express Scripts intended to wrongfully convert and retain Aetna Health's $75 million payment to complete the Purchase Option, and to deprive ASP the full and fair value of its acquisition and of its contractual benefits pursuant to the LLC Agreement and the DSA with Priority.

96.    Express Scripts and CuraScript knew, at all relevant times, that Priority would be required to candidly provide ASP with its third party supplier and manufacturer contracts and that Plaintiffs had the right to have full disclosure and transparency, including but not limited to the right to audit and the right to request analytic reports, to confirm that Plaintiffs were receiving Priority's best prices as required under the DSA.

97.    However, Defendants secretly decided that they would pervert, frustrate and interfere with Priority's obligations to Plaintiffs and that it would not honor those contractual obligations going forward in order to cheat ASP out of the benefit of its bargain with Priority and, in bad faith, to induce Plaintiffs to pay substantial monies to exercise the Purchase Option.

98.    Defendants' scheme was calculated to induce Aetna, ASP and Aetna Health to reasonably rely upon the misrepresentations from various levels of Priority representatives that

18

Priority would honor its obligations to Plaintiffs, including the important surviving obligations of the DSA.

99.    As a result of Defendants' tortious, unprivileged and unjustified conduct, Aetna, Aetna Health and ASP have suffered serious and ongoing financial injury.

100.    Plaintiffs, as a result of Defendants' misconduct, have not been provided the critical analytic and confirmatory information required under the DSA to determine Priority's best pricing covenants; nor have they been provided with the documentary evidence or an accounting of all rebates, discounts and revenues due from Priority to ASP as required under the LLC Agreement and the DSA.

101.    Further, as a result of the misconduct of Express Scripts, it is reasonable to assume that Plaintiffs have been forced to overpay millions of dollars for pharmaceuticals and other products now sold or supplied by ASP than they would have paid if Defendants had not interfered and prevented Priority from fully complying with its legal and contractual obligations under the LLC Agreement and DSA to ASP.

102.    Further, ASP has been deprived, as a result of Defendants' misconduct, of the ability to receive certain specialty drugs that are of limited availability and to which Priority had access to – which was sometimes exclusive – through its contracts with pharmaceutical manufacturers, vendors and suppliers.

103.    For example, after ASP exercised its Purchase Option, CuraScript and Express Scripts directed Priority not to provide ASP with a certain drug, in direct violation and contravention of the continuing obligations under the DSA.

19

104.    As a result of Plaintiffs being deprived of these specialty pharmaceutical products, Plaintiffs have been limited or prevented from opportunities to develop and grow new and emerging market opportunities, as envisioned in the LLC Agreement.

105.    Plaintiffs also, as a result of the conduct of Defendants, have been caused to suffer continuing substantial economic disadvantage and impairment of their present and prospective business opportunities

106.    From the execution of the Agreements through December 31, 2005, ASP, Aetna Health and Aetna fully performed their material obligations to Priority under the Agreements and, consistent with the parties' intent, ASP operated as an independent, stand-alone Specialty Pharmacy Business.

COUNT I<br>Tortious Interference With Existing Contracts

107.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

108.    As of August 1, 2004, and at all relevant times hereto, Aetna, Aetna Health, ASP and Priority were parties to the LLC Agreement. As of August 1, 2004, ASP, Aetna Health and Priority were also parties to the DSA.

109.    The LLC Agreement and the DSA were not terminable at will.

110.    Defendants were aware of the joint venture arrangement between Aetna, Aetna Health, ASP and Priority, including but not limited to Priority's continuing obligations under the DSA.

111.    Despite their awareness of Priority's obligations under the LLC Agreement and the DSA, Defendants implemented their tortious misconduct by directing Priority not to provide

20

relevant information or other contractual benefits to which Plaintiffs were entitled under the DSA and the LLC Agreement.

112.   Defendants intentionally, improperly, maliciously and knowingly interfered with the performance of Priority's contractual obligations under the DSA and the LLC Agreement, by causing Priority to breach its continuing and material obligations pursuant to the DSA and the LLC Agreement.

113.   Defendants possessed no privilege or justification for their intentional, reckless conduct undertaken with malicious indifference to Plaintiffs and others.

114.   Defendants' tortious misconduct caused and continues to cause, compensatory and punitive damages and irreparable harm to Plaintiffs.

115.   Defendants are liable for all damages caused to Plaintiffs for intentionally interfering with Priority's contracts with Plaintiffs and are subject to punitive damages.

116.   Defendants' conduct was malicious, willful, wanton and in reckless disregard of the lawful and legally protected interests of Plaintiffs.

117.   As a result of Defendants' misconduct, Plaintiffs have suffered damages in excess of the jurisdictional limits of this court.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendants, in an amount in excess of $100,000.00, reasonable investigation expenses, attorneys' fees, costs of suits, interests on all sums owed, and all such other legal and equitable relief that the Court deems just and proper, including exemplary damages as may be allowed by law.

21

## COUNT II
### Tortious Interference with Prospective Contractual Relations

118.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

119.    Plaintiffs had a reasonable opportunity to enter into additional contractual relationships relating to certain specialty pharmaceutical products.

120.    Defendants had the purpose or intent to harm the Plaintiffs by preventing these relations from occurring.

121.    Defendants possessed no privilege or justification for their intentional, reckless conduct undertaken with malicious indifference to Plaintiffs and others.

122.    As a result of the misconduct of Defendants, Plaintiffs have suffered damages in excess of the jurisdictional limits of this court.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendants, in an amount in excess of $100,000.00, reasonable investigation expenses, attorneys' fees, costs of suits, interests on all sums owed, and all such other legal and equitable relief that the Court deems just and proper, including exemplary damages as may be allowed by law.

## COUNT III
### Aiding and Abetting Breach of Fiduciary Duty

123.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

124.    Before ASP exercised its purchase option, Priority owned sixty percent (60%) of the ASP/Priority Joint Venture.

125.    Priority owed ASP, its joint venture partner, fiduciary duties.

22

126.    Priority also owed ASP fiduciary duties due to its dominant and superior position over ASP in the pharmacy industry.

127.    For example, ASP relied, *inter alia*, upon Priority's contacts, contracts and connections with drug suppliers and manufacturers.

128.    Priority, at the direction of Defendants, breached its fiduciary duties to ASP, *inter alia*, by failing to advise ASP that Express Scripts was negotiating to purchase Priority, by failing to inform ASP that Express Scripts and CuraScript had no intention of providing ASP its negotiated benefits under the DSA, including but not limited to its Best Pricing obligations and access to contracts with manufacturers, and by providing ASP with assurances concerning its intent to continue honoring obligations under the LLC Agreement and DSA after Plaintiffs exercised their purchase option when Priority knew that Defendants would not allow ASP to receive the benefits of those contracts after Plaintiffs paid them the $75 million pursuant to that option.

129.    Defendants Express Scripts and CuraScript directed, assisted and otherwise participated in Priority's breaches of its fiduciary duties to ASP.

130.    Defendants' conduct was malicious, willful, wanton and in reckless disregard of the lawful and legally protected interests of Plaintiffs.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendants, in an amount in excess of $100,000.00, reasonable investigation expenses, attorneys' fees, costs of suits, interests on all sums owed, and all such other legal and equitable relief that the Court deems just and proper, including exemplary damages as may be allowed by law.

23

## COUNT IV
### Civil Conspiracy

131.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

132.    Defendants Express Scripts and CuraScript, acting with common purpose, conspired with each other and Priority to do unlawful acts.

133.    Specifically, Defendants conspired to tortiously interfere with ASP's contractual rights under the LLC Agreements and the DSA.

134.    The Defendants further conspired to aid and abet Priority's breach of its fiduciary duties to ASP.

135.    Defendants performed overt acts in furtherance of their common purpose, including but not limited to directing Priority not to continue to provide ASP with the contractual benefits of the LLC Agreements and the DSA.

136.    For example, it is believed that Defendants directed Priority to provide Plaintiffs assurances concerning Priority's performance of its continuing obligations under the DSA and LLC Agreements, knowing that it would not allow Priority to honor those obligations.

137.    Further, after Plaintiffs exercised the Purchase Option, Defendants directed Priority not to provide certain drugs to ASP, in violation of Priority's continuing obligations under the DSA.

138.    ASP suffered actual legal damages as a result of Defendants' conspiracy.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendants, in an amount in excess of $100,000.00, reasonable investigation expenses, attorneys' fees, costs of suits, interests on all sums owed, and all such other legal and equitable

24

relief that the Court deems just and proper, including exemplary damages as may be allowed by law.

## COUNT V
### Unjust Enrichment

139.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

140.    Defendant Express Scripts received substantial financial benefits by engaging in its systematic interference with Plaintiffs' rights under the LLC Agreement and DSA.

141.    Specifically, on December 30, 2005, Aetna Health paid Defendant Express Scripts, with whom it had no contractual privity, $75,000,000.00 in connection with exercising the LLC Agreement's Purchase Option, and in anticipation that Aetna Health, ASP and Aetna would receive the benefit of Priority's continuing contractual obligations, after the exercise of the Purchase Option, pursuant to the DSA and the LLC Agreement.

142.    Defendants Express Scripts and CuraScript have been unjustly enriched by their interferences with and frustration of Plaintiffs' legitimate rights under the LLC Agreement and DSA and which have substantially impaired and rendered largely illusory material consideration promised by Priority under the terms of the Agreements.

143.    Although Defendants Express Scripts and CuraScript knew, before Aetna Health wired $75,000,00.00 directly to Express Scripts, that they would not allow Priority to perform its obligations under the DSA and LLC Agreements, including but not limited to providing ASP with access to its vendor, supplier and manufacturer contracts and complying with Priority's Best Pricing obligations, Defendants never honestly informed Plaintiffs that they would direct or otherwise

25

induce Priority not to comply with its continuing contractual obligations to Plaintiffs or that Priority would otherwise not perform its continuing contractual obligations to Plaintiffs.

144. Under these circumstances, it is inequitable for Defendant Express Scripts to retain the $75,000,000.00 without payment of value to Plaintiffs.

145. Defendant Express Scripts has been unjustly enriched in an amount in excess of $75,000,000.00 and must compensate Plaintiffs.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendants, in an amount in excess of $100,000.00, reasonable investigation expenses, attorneys' fees, costs of suits, interests on all sums owed, and all such other legal and equitable relief that the Court deems just and proper, including exemplary damages as may be allowed by law.

## COUNT V
### Detrimental Reliance

146. Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

147. Throughout its negotiations with Plaintiffs concerning the full effect of exercising their purchase option, Defendants Express Scripts and CuraScript repeatedly informed Plaintiffs that Priority would perform its continuing contractual obligations pursuant to the DSA and the LLC Agreements.

148. Defendants mislead Plaintiffs into believing that Priority would honor its contractual obligations after the exercise of the purchase option.

149. For example, in a November 18, 2005 letter to Eric Elliott sent on Express Script's letterhead, David Lowenberg stated that "[b]ased on Priority's contractual obligations

26

and our operational review, we are prepared to assist ASRx [ASP] in transitioning its product purchase arrangements to direct contractual arrangements between [ASP] and the third parties. The overall strategy for accomplishing this objective, as well as the tactics to be used, will need to be developed and discussed. We [Express Scripts] will be prepared to present such a plan for discussion."

150. Defendants also mislead Plaintiffs through their silence. Specifically, despite Plaintiffs' repeated communications with Express Scripts concerning Priority's post-option exercise contractual duties, Express Scripts never informed Plaintiffs that Priority would not perform such contractual obligations.

151. Plaintiffs were induced by and justifiably relied upon Defendant Express Scripts' misrepresentations and paid Defendant Express Scripts, with whom it had no contractual privity, $75,000,000.00 to exercise its purchase option under the LLC Agreement.

152. As a result of Plaintiffs' reliance upon Defendants' misstatements, as well as Defendants' silence concerning material benefits that Defendants knew they would prevent Plaintiffs from recognizing, Plaintiffs suffered damages, including but not limited to the $75,000,000.00 paid to Express Scripts in reliance upon Defendants' misrepresentations and silence.

153. In light of Defendants' knowing, malicious, willful, deliberate and bad faith misrepresentations and outrageous misconduct done in wanton contempt of Plaintiffs lawful rights, Plaintiffs are entitled to an award of punitive damages.

154. Plaintiffs therefore seek a return of all monies improperly acquired by Defendant Express Scripts, which has unjustly enriched Express Scripts.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendants, in an amount in excess of $100,000.00, reasonable investigation expenses, attorneys' fees, costs of suits, interests on all sums owed, and all such other legal and equitable ·relief that the Court deems just and proper, including exemplary damages as may be allowed by law.

## Count VI
### Express Scripts' Violation of 35 U.S.C. § 292(a)

155.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

156.    On September 1, 2006, Ronald A. Katz Technology Licensing, L.P. filed a complaint against Express Scripts (the "Katz Litigation") alleging infringement of sixteen patents relating to interactive phone call processing.

157.    Express Scripts entered into a confidential settlement of the Katx Litigation with Plaintiffs.

158.    In connection with the Katz Litigation, Express Scripts, as a publicly traded corporation, had a duty to investigate the factual and legal validity of Plaintiffs' claims.

159.    Accordingly, Express Scripts knew that certain of the patents claimed by Plaintiffs in the Katz Litigation had expired or were otherwise invalid.

160.    Despite knowing this, Defendant Express Scripts has posted, on its web site, a patent notice that states: "Express Scripts, Inc. and its subsidiaries are licensed under the following, and related Ronald A. Katz Technology Licensing, L.P. United States Patents: 5,128,984; 5,561,707; 5,684,863; 5,828,734; 5,917,893; 5,898,762; 5,974,120; and others." http://www.express-scripts.com/copyright/.

161.    Defendant Express Scripts' claim to the patents marked above is false.

162.    Specifically, United States Patents 5,561,707, 5,684,836, 5,815,551, 5,917,893, 5,898,762 and 5,974,120 have all expired.

163.    Accordingly, Express Scripts' use and/or mark of these patents is false.

164.    Defendant Express Scripts has engaged in one false marketing offense per patent for each day any expired patent appeared on its website or in any other literature.

165.    Defendant Express Scripts intended to deceive Plaintiffs and the public by representing that it possesses valid licenses for the patents listed above.

166.    Defendant Express Scripts' false patent marketing constitutes an exceptional case under 35 U.S.C. § 285.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendants, in an amount as provided by law and by 35 U.S.C. § 292(a) plus reasonable investigation expenses, and to declare Defendant's conduct exceptional under 35 U.S.C. § 285 and award Aetna attorneys' fees, costs and expenses of suit, interests on all sums owed, and all such other legal and equitable relief that the Court deems just and proper.

## Count VII
### Injunctive Relief

167.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

168.    Defendant Express Scripts' malicious, willful and wanton conduct, in reckless disregard of the legally protected interests of Plaintiffs, is ongoing and is causing, in addition to the economic damages as described above, irreparable injuries to Plaintiffs.

169.   Those injuries described above may be either irreparable or incapable of being easily calculated due to the invidious nature of the conduct and damages sustained.

170.   Economic damages alone are inadequate to compensate Plaintiffs.

171.   Further, absent relief from the Court said unlawful misconduct of Defendant Express Scripts is and will likely to be continued.

172.   Absent injunctive relief being granted by the Court it is likely that Defendants misconduct will continue.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendants and award all such other legal and equitable relief that the Court deems just and proper.

Respectfully submitted,

OF COUNSEL:
ELLIOTT GREENLEAF&
   SIEDZIKOWSKI, P.C.

/s/ James C. Crumlish, III ECF #JCC5010
JOHN M. ELLIOTT
JAMES C. CRUMLISH, III
JOHN P. ELLIOTT
Union Meeting Corporate Ctr. V
925 Harvest Drive
Blue Bell, PA 19422
(215) 977-1000

Counsel for Plaintiffs

DATED: December 31, 2007

30

# EXHIBIT G

**ⵎAetna®**

RECEIVED

JAN 2 9 2008

**Eric B. Myers**
Counsel
Law & Regulatory Affairs, U13N
980 Jolly Road
Blue Bell, PA 19426

(215) 775-6749
Fax: (860) 907-4416

January 28, 2008

**VIA OVERNIGHT MAIL**

Kelly R. Sullivan
CuraScript, Inc.
6272 Lee Vista Boulevard
Orlando, FL 32822

**Re:    Notice Pursuant to August 1, 2004 Drug Supply Agreement**

Dear Ms. Sullivan:

Thank you for your January 17, 2008 letter acknowledging receipt of Aetna Specialty Pharmacy, LLC's ("ASP") and Aetna Health Holdings, LLC's ("Aetna Health") January 2, 2008 demand for "full access" to "all books and records of Priority Healthcare Corporation ("Priority") that relate to Specialty Pharmaceuticals ordered by ASP under the terms of the August 1, 2004 Drug Supply Agreement ("DSA").

Although your January 17, 2008 letter acknowledges receipt of the audit demand, CuraScript, Inc. ("CuraScript") has not appropriately responded to the audit demand.  The audit rights asserted by ASP and Aetna Health are clear and unambiguous.  Accordingly, we do not believe the litigation referenced in your January 17, 2008 letter is relevant to any analysis of the merits of ASP's and Aetna Health's audit demand.  CuraScript's reliance upon that litigation as a basis for not timely responding to ASP's and Aetna Health's audit demand appears to be in bad faith and designed to avoid Priority's express and continuing contractual obligations.

Please produce the materials requested in my January 2, 2008 letter at the offices of Elliott Greenleaf & Siedzikowski, P.C., 925 Harvest Drive, Suite 300, Blue Bell, PA 19422 on or before February 14, 2008.  If we do not receive these materials by February 14, 2008, then we will be required to enforce our rights under the DSA.

Sincerely,

Eric B. Myers

**EXHIBIT**
**G**

# EXHIBIT H



**CuraScript**
The Pathway to the Patient

6272 Lee Vista Boulevard, Orlando, FL 32822
ph: 888.773.7376  www.CuraScript.com

*An Express Scripts Company*

February 8, 2008

**VIA FACSIMILE (860) 907-4416**
**AND U.S. MAIL**

Eric B. Myers, Esq.
Counsel
Law & Regulatory Affairs, U13N
980 Jolly Road
Blue Bell, PA 19426

Re:     Notice Pursuant to August 1, 2004 Drug Supply Agreement

Dear Mr. Myers:

I write in response to your letter of January 28, 2008.

Pursuant to Section 4.1 of the Drug Supply Agreement ("DSA"), and "subject to any legal restrictions or restrictions necessary to maintain their confidentiality," Priority will provide Aetna Specialty Pharmacy, LLC ("ASP") and Aetna Health Holdings, LLC ("Aetna Health") with access to Priority's books and records that relate to the Specialty Pharmaceuticals identified in your January 2, 2008 letter which were ordered by ASP between August 1, 2004 and December 3, 2007. Contrary to your request, however, and pursuant to Section 4.1, those books and records will be made available during normal business hours at Priority's offices so that they can be reviewed and copied by ASP and Aetna Health at their expense. Moreover, the confidentiality provisions set forth in Section 4.3 of the DSA shall apply to all books and records that ASP and/or Aetna Health reviews or copies.

We are in the process of working to identify the necessary "books and records" and will contact you to arrange a mutually agreeable date for the review. In the meantime, in order to avoid any misunderstandings concerning the scope of the review, please identify specifically which "books and records" your clients would like to review, as well as the person from ASP and/or Aetna Health that will conduct the review.



EXHIBIT

**H**

Correspondence to Eric B. Myers, Esquire
February 08, 2008
Page 2

Also, in light of the litigation filed by your clients, please advise your clients to preserve and retain all documents, records and communications (electronic or otherwise) which relate to: (1) the DSA; (2) the Limited Liability Company Agreement; (3) the Contribution Agreement; (4) the Build and Services Agreement; (5) the Participating Provider Agreement; (6) the Back-Up Provider Agreement; (7) the discussions and negotiations concerning Aetna Health's purchase of Priority's membership interest in ASP; and (8) any and all documents (such as contracts, communications and financial documents) relating to any prescription drugs and supplies purchased by, or on behalf of, ASP from any source since August 1, 2004.

Finally, your letter of January 2 claims that ASP and Aetna Health have "repeatedly requested confirmation that Priority was providing...ASP with the benefit of Priority's 'Best Prices'...." I am presently unaware of any such requests. Please identify when those requests were made, who from ASP or Aetna Health made those requests, the person the requests were directed to, and whether the requests were written or oral.

Sincerely,

Kelly R. Sullivan

# EXHIBIT I

**ЖAetna®**

RECEIVED

MAR 0 4 2008

Eric B. Myers
Counsel

Law Department – U13N
980 Jolly Road
Blue Bell, PA 19422
Tel. (215) 775-6749
Efax. (860) 907-4416
Email. MyersE@aetna.com

VIA UPS OVERNIGHT DELIVERY

March 3, 2008

Kelly R. Sullivan
CuraScript, Inc.
6272 Lee Vista Boulevard
Orlando, FL 32822

    **Re:    Notice Pursuant to August 1, 2008 Drug Supply Agreement**

Dear Ms. Sullivan:

    This letter responds to your February 8, 2008 correspondence. As you are aware, and as previously indicated in our correspondence dated January 2, 2008, Aetna Specialty Pharmacy, LLC ("ASP") and Aetna Health Holdings, LLC ("Aetna") are seeking, pursuant to the terms of the Drug Supply Agreement ("DSA"), all documents which are required to demonstrate that Priority and its affiliates are provided and continue to provide ASP with their 'Best Prices," as defined in Section 1.7 of the DSA, for those pharmaceutical products identified in our January 2, 2008 demand.

    As Priority is in possession of the relevant information, it is aware of the specific information that must be produced for ASP's inspection. As you know, the DSA broadly defines Best Price" to include, *inter alia,* Third-Party Supplier invoices:

> net of all rebates and discounts, returns, credits and other similar adjustments, including any funds or credits from manufacturers and other incentives, regardless of when or how paid or credits.

DSA § 1.7. The audit provisions specifically require Priority to provide ASP and/or Aetna with "all books and records . . . including all books and records relevant to the calculation of [Priority's] Best Prices and the calculation and crediting of rebates, discounts, returns, credits, incentives and other adjustments applicable to orders placed by ASP under this Agreement . . . ." DSA § 4.1. As ASP and Aetna are not aware of the



Page 2
Kelly R. Sullivan
March 3, 2008

specific contracts and other arrangements Priority has with manufacturers and suppliers, it is unproductive for Priority to require ASP and Aetna to speculate as to the nature of the relevant universe of documents. ASP and Aetna continue to demand access to all documents to which they are entitled under the express terms of the DSA, including but not limited to the terms identified above.

By way of further clarification, we are also, as you are aware, entitled to review Priority and its affiliates agreements and contracts with Third-Party Suppliers, manufacturers and wholesalers, again to determine Priority and its affiliate's performance under its Best Prices guarantees to ASP. DSA §§ 2.2; 3.3; 4.1. Those documents must be made available for inspection.

We are in the process of making the arrangements to review of all of the documents you are required to make available to us under the DSA. We request that you unequivocally confirm that you will have all of them available for inspection in a reasonably accessible form and that you will also provide adequate office space and facilities onsite so ASP and its representatives may conduct the required examination and make such copies or duplicates of the data or documents as it may require. We would like to conduct the audit from March 19, 2008 through and including March 22, 2008. Please promptly confirm these dates or provide alternative dates so that we can move this process forward.

Sincerely,

ERIC B. MYERS

# EXHIBIT J



4775 aee Vista Boulevard  Orlando  FL  32822
ph  866.773.1376  www.CuraScript.com

*illegible*

March 5, 2008                                        Writer's Direct Dial: 407-816-9873

**VIA FACSIMILE (860) 907-4416
AND U.S. MAIL**

Eric B. Myers, Esq.
Counsel
Law & Regulatory Affairs, U13N
980 Jolly Road
Blue Bell, PA 19426

Re:    **August 1, 2004 Drug Supply Agreement Audit**

Dear Mr. Myers:

This letter is in response to yours dated March 3, 2008. I propose that we convene a
telephone call for the purpose of discussion of your request in order to ensure that we
have pulled the applicable documents. I will want my outside counsel to participate in
the call. Please propose some dates and times next week that will work for you. I will be
traveling Monday morning and Wednesday afternoon, but can otherwise accommodate
your schedule.

Sincerely,

*Kelly Sullivan*

Kelly R. Sullivan

KRS/ikc

**EXHIBIT**

**J**

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Priority Healthcare Corporation

## DEFENDANTS

Aetna Specialty Pharmacy, LLC and Aetna Health Holdings, LLC

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Richard L. Horwitz (#2246)/David E. Moore (#3983)
Potter Anderson & Corroon LLP
1313 N. Market Street
Wilmington, Delaware 19801    (302) 984-6000

Attorneys (If Known)

## II. BASIS OF JURISDICTION    (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 | U.S. Government Plaintiff |
| ☐ 2 | U.S. Government Defendant |
| ☐ 3 | Federal Question (U.S. Government Not a Party) |
| ☒ 4 | Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                    and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT    (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | **PERSONAL INJURY** | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 362 Personal Injury— Med. Malpractice | ☐ 625 Drug Related Seizure of Property 21 USC | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 365 Personal Injury — Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus: | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | |
| | | ☐ 555 Prison Condition | | |

## V. ORIGIN    (PLACE AN "X" IN ONE BOX ONLY)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION    (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Declaratory Judgment in accordance with Rule 57 of the Federal Rules of Civil Procedure and 35 U.S.C §§ 2201

## VII. REQUESTED IN    ☐ CHECK IF THIS IS A CLASS ACTION    DEMAND $ _____    CHECK YES only if demanded in complaint:
## COMPLAINT:    UNDER F.R.C.P. 23    JURY DEMAND:  ☐ Yes  ☒ No

## VIII. RELATED CASE(S)    (See instructions):
## IF ANY    JUDGE _____    DOCKET NUMBER _____

DATE
03/13/2008

SIGNATURE OF ATTORNEY OF RECORD
_[signature]_

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

JS 44 Reverse (Rev. 12/96)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.    **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b.) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.    **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States, are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.    **Residence (citizenship) of Principal Parties.** This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.    **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.    **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a) Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

VI.    **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause.

VII.    **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.    **Related Cases.** This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____ 4 8 _____

## **ACKNOWLEDGMENT**
## **OF  RECEIPT  FOR AO FORM  85**

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____ COPIES OF AO FORM 85.

_____
(Date forms issued)

_____
(Signature of Party or their Representative)

_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action