IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PRIORITY HEALTHCARE CORPORATION, :
:
        Plaintiff, :
:
  v. : Civil Action No. 08-148-JJF
:
AETNA SPECIALTY PHARMACY, LLC and :
AETNA HEALTH HOLDINGS, LLC, :
:
        Defendants. :

Joseph P. Conran, Esquire; Christopher J. Valeriote, Esquire; Omri E. Praiss, Esquire and Christopher A. Smith, Esquire of HUSCH BLACKWELL SANDERS LLP, St. Louis, Missouri.
Richard L. Horowitz, Esquire and David E. Moore, Esquire of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware.
Attorneys for Plaintiff.

Frederick P. Santarelli, Esquire and Elizabeth A. Williams, Esquire of ELLIOTT GREENLEAF & SIEDZIKOWSKI, P.C., Blue Bell, Pennsylvania.
William M. Kelleher, Esquire and Neil R. Lapinski, Esquire of ELLIOTT GREENLEAF, Wilmington, Delaware
Attorneys for Defendant.

**MEMORANDUM OPINION**

December 18, 2008
Wilmington, Delaware.

Farnan, District Judge

    Pending before the Court is a Motion To Dismiss Complaint For Declaratory Judgment (D.I. 7) filed by Defendants, Aetna Specialty Pharmacy, LLC and Aetna Health Holdings, LLC.  For the reasons discussed, the Court will grant the Motion.

**I. BACKGROUND**

    Plaintiff, Priority Healthcare Corporation ("Priority"), filed this action for declaratory judgment on March 13, 2008, requesting the Court to declare certain rights and obligations of the parties that are in dispute under a Drug Supply Agreement ("DSA") entered into between Priority and Defendants.  As set forth in the Complaint, Priority alleges that it entered into the DSA with Defendants on August 1, 2004.  Pursuant to the terms of the DSA, Priority agreed to supply Defendant Aetna Specialty Pharmacy, LLC ("ASP") with certain specialty pharmaceuticals. The DSA contains a termination provision which provides that the DSA terminates the later of February 28, 2008 or the date Priority ceases to be a member of ASP.  The clause also provides for certain renewal terms and states that "[u]pon expiration of the Term, all obligations of the Parties hereunder shall terminate, except as otherwise specifically provided herein." (DSA at ¶ 7.1.)  In October 2005, Express Scripts ("Express Scripts") acquired Priority, and on December 30, 2005, Priority

1

ceased being a member of ASP. No renewals of the agreement were exercised, and therefore, the DSA terminated on February 28, 2008, except as otherwise provided in the DSA.

In this regard, the DSA also contained a section entitled, "Transition Agreements and Transition Services Agreement." In pertinent part, this section provides:

> Upon the expiration or proper termination of this Agreement for any reason whatsoever ASP and Priority will negotiate in good faith a transition services agreement with a term of up to one (1) year commencing upon such expiration or termination; provided, however, that such transition services agreement shall, at ASP's option, include, but not be limited to, the provision by Priority to ASP of an uninterrupted supply of all Specialty Pharmaceuticals required by ASP. All purchases of Specialty Pharmaceuticals by ASP pursuant to such transition services agreement shall be at Priority's Best Price. Furthermore, as part of any such transition services agreement, Priority will assist ASP in transitioning direct contractual relationships with all necessary drug wholesalers and manufacturers from Priority to ASP.

(Id. at ¶ 7.2.4.)

As a result of the termination of the DSA, the Complaint alleges that beginning February 29, 2008, Priority would no longer supply pharmaceutical drugs to Defendants under the DSA. By letter dated February 27, 2008, Defendants reminded Priority that the DSA requires Priority to negotiate in good faith a transition services agreement, "including but not limited to continuing to provie ASP with Priority's Best Pricing through February 29, 2009." (D.I. 1 at Ex. B.)

2

By letter dated February 28, 2008, Priority advised Defendants that they "failed to timely invoke Section 7.1" of the DSA. (Id. at Ex. C.) Priority also asserted that Section 7.2.4 of the DSA is unenforceable because it fails to "specify all the material and essential terms of any future 'transition services agreement.'" (Id.) Specifically, Priority alleges that "the language in Section 7.2.4 that purports to require Priority and ASP to negotiate a transition services agreement is unenforceable because it is nothing more than an agreement to agree in the future without any reasonably objective standards concerning the length of any such agreements - which is a material and essential term." (Id.)

Despite its position regarding the unenforceability of Section 7.2.4, Priority stated that it was willing in good faith to negotiate some type of arrangement to extend the terms of the DSA "for a short period of time (but certainly not through February 28, 2009)." (Id.) Priority also informed Defendants that if a mutually acceptable short-term transition services agreement was not entered into by March 7, 2008, the DSA would terminate without any further notice or action at the close of business on March 7, 2008.

Priority alleges that Defendants did not respond to the February 28, 2008 letter and no short term transition agreement was reached by March 7, 2008. Therefore, Priority argues that

3

its obligations terminated as of March 7, 2008 at the latest. Defendants contend that Priority is obligated to continue to provide Priority with its Best Pricing through February 29, 2009.

The Complaint also contains allegations regarding Defendants' right to inspect Priority's records as provided in Section 4.1 of the DSA. Defendants sought to invoke this provision to inspect all of Priority's books and records "that form the basis of Priority's 'Best Prices,' by month as calculated on the first business day of each month from August 1, 2004 through December 3, 2007" for twenty-five different pharmaceuticals. (D.I. 1 at ¶ 24.) Priority responded by advising Defendants that it had to evaluate the request in light of certain litigation filed by Defendants against Express Scripts and CuraScripts, Inc. ("CuraScripts") on December 31, 2007, in the United States District Court for the Eastern District of Pennsylvania (the "Scripts litigation"). The Complaint in the Scripts litigation alleges, among other things, that Express Scripts and CuraScripts tortiously interfered with Priority's obligations under the DSA. Defendants also allege that since January 1, 2006, they have been forced to purchase specialty pharmaceuticals from third parties because Express Scripts improperly directed Priority not to sell these drugs to Defendants. Express Scripts denied the allegation and sought to transfer the action to this Court. Since the filing of the

4

Complaint in this Action, the motion to transfer was denied.

A second request for access to Priority's books and records was made by Defendants on January 28, 2008 for all records "that relate to Specialty Pharmaceuticals ordered by ASP under the terms of the August 1, 2004 Drug Supply Agreement." (D.I. 1, Ex. G.)  Priority responded to this second request by advising Defendants that it could have access to the records identified in the January 2 letter which were ordered by ASP between August 1, 2004 and December 3, 2007.  (Id., Ex. H.)  The parties attempted a meet and confer to verify the documents at issue, but their differences were not resolved.  Accordingly, Priority alleges that a genuine legal controversy exists between the parties concerning the interpretation of Section 4.1.  Specifically, Priority contends that Defendants "claim that they are entitled to review all the books and records of Priority that form the basis of Priority's 'Best Prices' (from August 1, 2004 through December 3, 2007) for twenty-five (25) different specialty pharmaceuticals, despite the fact that Defendants did not order twenty-four of those drugs under the DSA, but rather Defendants ordered such drugs under separate agreements entered into between Defendants and pharmaceutical manufacturers."  (D.I. 1 at ¶ 34.)  However, Priority contends that Defendants are only entitled to review the books and records of Priority "that form the basis of Priority's 'Best Prices' (from August 1, 2004 through December 3,

2007) for only those drugs that Defendants actually ordered under the DSA - either directly from Priority or from drug manufacturers pursuant to the terms and conditions of agreements between Priority and drug manufacturers." (Id. at ¶ 36.)

After Priority filed its Complaint seeking declaratory judgment regarding the parties' rights and obligations under Sections 7.1, 7.2.4 and 4.1 of the DSA, Defendants filed the instant Motion to Dismiss. By their Motion, Defendants request dismissal based on lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and the Declaratory Judgment Act.

## II. STANDARD OF REVIEW

### A. Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for lack of subject matter jurisdiction. Motions brought under Rule 12(b)(1) may present either a facial or factual challenge to the court's subject matter jurisdiction. In reviewing a facial challenge under Rule 12(b)(1), the standards relevant to Rule 12(b)(6) apply. In this regard, the court must accept all factual allegations in the complaint as true, and the court may only consider the complaint and documents referenced in or attached to the complaint. Gould Elec. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000). In reviewing a factual challenge to the court's subject matter jurisdiction, the

6

court is not confined to the allegations of the complaint, and the presumption of truthfulness does not attach to those allegations. Mortensen v. First Fed. Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir.1977). Instead, the court may consider evidence outside the pleadings, including affidavits, depositions and testimony, to resolve any factual issues bearing on jurisdiction. Gotha v. United States, 115 F.3d 176, 179 (3d Cir. 1997). Once the court's subject matter jurisdiction over a complaint is challenged, Priority bears the burden of proving that jurisdiction exists. Mortensen, 549 F.2d at 891.

    B.    The Declaratory Judgment Act

The Declaratory Judgment Act does not create a basis for federal jurisdiction. Rather, jurisdiction must be established in accordance with Article III, Section 2 of the Constitution, and therefore, jurisdiction under the Declaratory Judgment Act requires an actual controversy between the parties. 28 U.S.C. § 2201(a); EMC Corp. v. Norand Corp., 89 F.3d 807, 810 (Fed. Cir. 1996), overruled in part on other grounds, MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007)). More specifically, jurisdiction over a declaratory judgment action requires that "the dispute be definite and concrete, touching the legal relations of parties having adverse legal interests and that it be real and substantial and admit of specific relief through a decree of conclusive character, as distinguished from an opinion

advising what the law would be upon a hypothetical state of facts." MedImmune, 127 S. Ct. at 771. Even if the jurisdictional prerequisites of subject matter jurisdiction are otherwise satisfied, the court retains the discretion to determine whether and when to exercise jurisdiction under the Declaratory Judgment Act. Wilton v. Seven Falls Co., 515 U.S. 277, 286-287 (1995). The factors considered by the Court in exercising its discretion include, but are not limited to: (1) whether declaratory relief would clarify and settle the legal relations in issue; (2) the convenience of the parties; (3) the public interest in a settlement of the uncertainty of obligation, (4) the availability and relative convenience of other remedies; and (5) whether the declaratory judgment act is being used for "procedural fencing," "forum shopping," or as a means to provide another forum in a "race" for res judicata. Terra Nova Insurance Co. v. 900 Bar, Inc., 887 F.3d 1213, 1224 (3d Cir. 1989).

### III. DISCUSSION

By their Motion, Defendants contend that Priority cannot establish subject matter jurisdiction because an actual case or controversy does not exist. Defendants contend that Priority's Complaint alleges that the parties are in the midst of discussing their respective views concerning certain contractual matters, and suggests a "mere disagreement" between the parties. Defendants further contend that Priority has failed to plead any

adverse consequences that demonstrate an immediate need for declaratory relief.

Defendants also request dismissal on the basis of ripeness. Defendants contend that this action is not ripe, because Priority has failed to allege any adversity of interest or hardship to the parties.

In the alternative, Defendants urge the Court to exercise its discretion to decline to exercise jurisdiction over this action.  In this regard, Defendants contend that Priority is using this action for two improper purposes:  (1) to forum shop in order to circumvent the Pennsylvania litigation, and (2) to circumvent the dispute resolution procedures provided for in paragraph 9.11 of the DSA.

Assuming, without deciding, that the requirements for subject matter jurisdiction are met in this case, the Court declines, in its discretion, to exercise jurisdiction over this declaratory judgment action.  In reaching this conclusion, the Court notes the suggestion of forum shopping raised by Defendants, but is more persuaded by the important policy considerations implicated by Defendants' contention that Priority failed to comply with the dispute resolution procedures in the DSA.  In response to this contention, Priority contends that (1) it repeatedly attempted in good faith to resolve this dispute with Defendants but that further discussions would have been

futile, and (2) the DSA does not incorporate a dispute resolution process that has any application in this case.

After further briefing by the parties, however, it is apparent to the Court that the DSA does contain a dispute resolution process that is fully applicable to this case. Specifically, Section 9.11 of the DSA provides:

> <u>Dispute Resolution.</u> Any controversy, claim or dispute arising out of or relating to this Agreement or the performance, breach, termination, enforceability, or validity thereof, including without limitation, assertions as to the inducement of the Agreement by fraud or otherwise and the determination of the scope or applicability of the Parties' agreement to submit to binding arbitration shall be subject to the dispute resolution provisions set forth in Article XIII of the Operating Agreement.

Priority contends that this section does not apply, because Section 13.1 of the Operating Agreement states that the dispute resolution procedures apply "except as otherwise expressly set forth herein or in any Ancillary Agreement." Priority contends that this caveat is met in Section 9.4 of the DSA which provides:

> <u>Governing Law, Jurisdiction and Venue.</u> The parties acknowledge and agree that this Agreement shall be construed and enforced in accordance with the laws of the State of Delaware, without regard to the internal law of Delaware regarding conflicts of law. **The parties consent and submit to the jurisdiction of the federal and/or state courts of the state of Delaware and any action or suit concerning this agreement or related matters shall only be brought by the parties in federal or state court with appropriate subject matter jurisdiction in the State of Delaware.** The Parties acknowledge and agree that they shall not raise in connection therewith, and hereby waive, any defenses based upon venue, inconvenience of forum or lack of

10

>     personal jurisdiction in any action or suit brought in
>     accordance with the foregoing. . . .

(emphasis added). In the Court's view, Priority's interpretation of Section 9.4 as precluding arbitration effectively excises Section 9.11 from the DSA in its entirety. Such an approach is incongruous with the basic principle of contract interpretation - that a contract should not be read so as to render any terms or provisions meaningless. 11 Williston on Contracts § 32:5 (4th ed.) ("An interpretation which gives effect to all provisions of the contract is preferred to one which renders a portion of the writing superfluous, useless or inexplicable. A court will interpret a contract in a manner that gives reasonable meaning to all of its provisions, if possible."). In this case, harmonious construction of Section 9.4 and Section 9.11 of the DSA, as well as Article XIII of the Operating Agreement, is achieved with the interpretation proposed by Defendants. Specifically, the consent to jurisdiction and venue in Delaware under Section 9.4 applies to court actions arising _after_ the completion of the arbitration procedures referenced in Section 9.11 or for court actions initiated to obtain temporary injunctive relief _pending_ arbitration. In light of this interpretation, the Court's exercise of jurisdiction over this declaratory judgment action would effectively void a mutually agreed upon and enforceable term of the parties' contract. That this contract term provides for binding arbitration over the types of disputes raised by this

11

action (e.g. termination, performance and breach of the DSA), is of particular importance to the Court in light of the public policy interest in enforcing arbitration clauses, particularly where, as here, they have been expressly agreed to by contracting parties. In light of these circumstances, the Court to declines to exercise its discretion to hear this declaratory judgment action.

## CONCLUSION

For the reasons discussed, the Court will grant Defendants' Motion To Dismiss.

An appropriate Order will be entered.